<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RAFIEEK GRAHAM, | : | |
| | : | Civil Action No. 10-5563 (SRC) |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| KENNETH SHARP, et al., | : | |
| | : | |
| Defendants. | : | |

**APPEARANCES:**

> RAFIEEK GRAHAM, Plaintiff <u>pro</u> <u>se</u>
> #00083
> East Jersey State Prison, Special Treatment Unit
> CN 905, 8 Production Way
> Avenel, New Jersey 07001

**SHERIDAN**, District Judge

Plaintiff, Rafieek Graham, an involuntarily committed person pursuant to the Sexually Violent Predator Act ("SVPA"), <u>N.J.S.A.</u> 30:4-27.24, <u>et</u> <u>seq.</u>, seeks to bring this action <u>in</u> <u>forma</u> <u>pauperis</u>. Based on his affidavit of indigence, the Court will grant plaintiff's application to proceed <u>in</u> <u>forma</u> <u>pauperis</u> ("IFP") pursuant to 28 U.S.C. § 1915(a) (1998) and order the Clerk of the Court to file the Complaint.

At this time, the Court must review the Complaint and plaintiff's several addendums, pursuant to 28 U.S.C. § 1915(e)(2), to determine whether the action should be dismissed as frivolous or malicious, for failure to state a claim upon

which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief.  For the reasons set forth below, the Court concludes that this action should be dismissed as duplicative, and for failure to state a claim.

I.  <u>BACKGROUND</u>

Plaintiff, Rafieek Graham ("Graham"), brings this civil rights action, pursuant to 42 U.S.C. § 1983, against the following defendants: Kenneth Sharp, Assistant Attorney General for the State of New Jersey; Jennifer Velez, Commissioner of the New Jersey Department of Human Services ("NJDHS"); John Main, Chief Executive Officer of Mental Health at the Ann Klein Forensic Center; Dr. Merril Main, Clinical Director of the East Jersey State Prison, Special Treatment Unit ("EJSP-STU"); Steven Johnson, Assistant Superintendent at the EJSP-STU; Shantay Brame Adams, Assistant Director at the EJSP-STU; and Jackie Ottino, Program Coordinator at the EJSP STU.  (Complaint, Caption and ¶¶ 4b-4h).  The following factual allegations are taken from the Complaint, and are accepted for purposes of this screening only. The Court has made no findings as to the veracity of plaintiff's allegations.

The Court notes that this is the third action filed by Graham with regard to his civil confinement at the STU in EJSP. His first action, <u>Graham v. Christie, et al.</u>, Civil No. 10-2010 (KSH), was dismissed without prejudice by Opinion and Order

issued by the Honorable Katharine S. Hayden on or about October 18, 2010.  In that action, he raised similar claims against three of the same defendants named in this present matter, namely, NJDHS Commissioner Velez, Steven Johnson, and Merril Main.

The instant Complaint also alleges the same or similar claims against many of the same defendants in a second, earlier-filed action submitted on or about September 25, 2010, in Graham v. Main, et al., Civil No. 10-5027 (SRC).  In particular, defendants, Velez, John Main, Merril Main, Shantay Brame Adams and Jackie Ottino are named defendants in both actions.  The second action recently has been dismissed by this Court for failure to state a claim upon which relief may be granted.

Only defendant Kenneth Sharp is named in this action and not in the earlier matters.  In this third action, Graham continues to complain about his confinement at the EJSP STU, and what he alleges are unconstitutional restrictions and conditions placed on him as a civilly committed person.

In this Complaint, Graham alleges that defendants Kenneth Sharpe, John Main, and Steve Johnson, have disregarded that plaintiff is a civilly committed resident and not a prisoner.  Graham states that these defendants have allowed the New Jersey Department of Corrections ("NJDOC") to house plaintiff on prison property in a unit designed for 23 hour lock down, which is a violation of his constitutional rights.  Further, these

defendants have placed plaintiff under prison policy and guidelines. (Compl., ¶¶ 4b, 4d and 4f).

Graham also contends that Commissioner Velez failed to oversee the conditions at EJSP-STU, which had gated tiers and boarded therapy rooms. He complains that Velez and defendant Merril Main allowed plaintiff to be placed under prison guidelines and to be treated as a problem prisoner. Velez further allowed the NJDOC to "force" the therapy staff off the EJSP-STU premises after 4 p.m. (Compl, ¶ 4c, 4e).

Next, Graham alleges that defendant Adams had plaintiff placed on a unit that is segregated from the therapy groups, causing plaintiff to be labeled as a threat, and sexually harassed by correctional officers because Graham had expressed concern about being placed back in a prison. (Compl., ¶ 4g). Graham alleges that defendant Ottino has authorized the correctional officers to harass plaintiff and try to get plaintiff placed on "MAP" status because Graham writes grievances.(Compl., ¶ 4h).

In particular, Graham alleges that, on May 12, 2010, when he arrived at EJSP-STU, he was placed on the South Unit, which is segregated from the general resident population. Graham admits that he was told he was on the South Unit because he had refused treatment, but denies that he had refused treatment. He

complains that his segregation keeps him from attending groups and other treatment programs. (Compl., ¶ 6).

On May 27, 2010, there were no therapists or other NJDHS staff on EJSP-STU grounds after 4 p.m., because the NJDOC had the staff move their office supplies off the grounds to a building in Edison, New Jersey. Thus, there is no on-site psychiatrist to talk to after 4 p.m. (Id.). On July 16, 2010, Graham states that he almost was placed on treatment probation for not attending groups because the NJDOC officers dictated how therapy groups were to be run. The treatment probation was threatened by his group therapist Ms. Vega and by defendant Adams. On July 26, 2010, Graham was told that he had to "move to groups on [the NJDOC's] call." (Id.).

Graham next complains that his mail and packages are sent to two different facilities in Avenel, New Jersey, not at EJSP-STU, where plaintiff resides. Graham also alleges that he has filed grievances with defendants, Main, Adams and Johnson and with NJDOC Chief Cathy Buchannan, about the correctional officers treating Graham like a problem prisoner. (Id.).

On August 25, 2010, plaintiff was verbally harassed by correctional officers while he was in the yard. Graham complains that he was humiliated and mentally degraded. On September 28, 2010, Graham states that he was called a "fag," "homo," and was sexually harassed verbally about his "gender of life" by

correctional officers who were authorized to do so by defendants Ottino and Adams.  (Id.).

On September 24, 2010, Graham states that defendants Adams and Ottino had his "only mental support moved off the unit" because plaintiff was filing too many grievances.  Graham complains that his mental support, apparently another resident, was his support for the last ten years.  (Id.).

Graham further alleges that therapy groups are conducted by NJDOC movements, causing plaintiff to be taken out of groups.  He says that groups are held in a caged area boarded up by a fence. There is limited participation in open recreation areas.  (Id.).

Graham asks to be placed in a federally funded treatment facility, He also seeks monetary compensation for being placed in a prison environment where he has suffered mental anguish, harassment, discrimination, and having to start all over with treatment after being in for ten years.  (Compl., ¶ 7).

On or about November 29, 2010, Graham submitted an amended Complaint to the Court seeking to add additional defendants to this action.  (Docket entry no. 3).  He seeks to add Mark Singer, Deputy Attorney General (for overlooking and disregarding the fact that plaintiff is a civilly committed resident to be placed in a treatment facility and not a prisoner in a prison facility); David L. DaCosta (for failing to oversee and correct conditions at EJSP-STU where plaintiff is humiliated by NJDOC officers and subjected to 10:A prison policy); and Brian Friedman, Psychology

6

Director at EJSP-STU (for having knowledge about the "untherapeutic" system at EJSP-STU and overlooking the NJDOC's termination of groups, dictating group movements and placing residents under prison policy). (Id., at ¶ 4b, 4c and 4d). Graham repeats his general allegations against defendant Velez. (Id., at ¶ 4e).

In particular, Graham states that, on November 27, 2010, he was strip searched. On November 1, 2010, he was presented with a memo stating that certain electronic equipment would not be permitted subject to a policy change. The memo was attached to the amended Complaint at Docket entry no. 3-1. Plaintiff also was told that he and other civilly committed residents would be placed under prison policy. (Id., at ¶ 6). These claims and allegations were raised in Graham's second and earlier filed action, Graham v. Main, et al., Civil No. 10-5027 (SRC), and are thus, duplicative.[1]

Graham also submitted a letter on December 6, 2010 (Docket entry no. 6), in which he complains that in June 2010, a staff psychologist stated to plaintiff "off the record" that plaintiff "does not belong here." But, on August 9, 2010, Graham's public advocacy attorney stopped the psychologist from testifying in court, preventing plaintiff from being released to an outpatient program. (Id.). Graham states that he filed an attorney ethics

---

[1] Also on November 29, 2010, Graham sent an addendum to the Court. (Docket entry no. 4). The addendum relates the very same claims as set forth in his Complaint.

7

grievance in October 2010.  He claims that since he filed his
Complaints, he was placed on treatment refusal and his job was
taken by the treatment team, allegedly for no other reason than
his filing complaints.  (Id.).

## II.   STANDARDS FOR A SUA SPONTE DISMISSAL

A district court is required to review a complaint in a
civil action where the litigant is proceeding in forma pauperis.
Specifically, the court is required to identify cognizable claims
and to sua sponte dismiss any claim that is frivolous, malicious,
fails to state a claim upon which relief may be granted, or seeks
monetary relief from a defendant who is immune from such relief,
pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because Boss
is proceeding in forma pauperis in this matter, this action is
subject to sua sponte screening for dismissal under 28 U.S.C. §
1915(e)(2)(B).

In determining the sufficiency of a pro se complaint, the
Court must be mindful to construe it liberally in favor of the
plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94
(2007)(following Estelle v. Gamble, 429 U.S. 97, 106 (1976) and
Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  See also United
States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must
"accept as true all of the allegations in the complaint and all
reasonable inferences that can be drawn therefrom, and view them
in the light most favorable to the plaintiff."  Morse v. Lower
Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court

8

need not, however, credit a pro se plaintiff's "bald assertions" or "legal conclusions." Id.

A complaint is frivolous if it "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)).  The standard for evaluating whether a complaint is "frivolous" is an objective one. Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A pro se complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Haines, 404 U.S. at 521 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). See also Erickson, 551 U.S. at 93-94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2)).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).  The issue before the Supreme Court was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in discriminatory decisions regarding Iqbal's treatment during detention at the Metropolitan Detention Center which, if true, violated his constitutional rights. Id.  The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides

9

that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).[2]  Citing its recent opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' "Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 555), the Supreme Court identified two working principles underlying the failure to state a claim standard:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... .  Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

Iqbal, 129 S.Ct. at 1949-1950 (citations omitted).

The Court further explained that

> a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a

---

[2]  Rule 8(d)(1) provides that "[e]ach allegation must be simple, concise, and direct.  No technical form is required." Fed.R.Civ.P. 8(d).

> complaint, they must be supported by factual allegations.
> When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they
> plausibly give rise to an entitlement to relief.

Iqbal, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must now allege "sufficient factual matter" to show that a claim is facially plausible. This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1948. The Supreme Court's ruling in Iqbal emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible. Id. at 1949-50; see also Twombly, 505 U.S. at 555, & n.3; Fowler v. UPMC Shadyside, 578 F.3d 203, 210(3d Cir. 2009).

Consequently, the Third Circuit observed that Iqbal provides the "final nail-in-the-coffin for the 'no set of facts' standard" set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[3] that applied to federal complaints before Twombly. Fowler, 578 F.3d at 210. The Third Circuit now requires that a district court must conduct the two-part analysis set forth in Iqbal when presented with a motion to dismiss:

---

[3] In Conley, as stated above, a district court was permitted to summarily dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Id., 355 U.S. at 45-46. Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

> First, the factual and legal elements of a claim should be
> separated.  The District Court must accept all of the
> complaint's well-pleaded facts as true, but may disregard
> any legal conclusions. [Iqbal, 129 S.Ct. at 1949-50].
> Second, a District Court must then determine whether the
> facts alleged in the complaint are sufficient to show that
> the plaintiff has a "plausible claim for relief." [Id.]  In
> other words, a complaint must do more than allege the
> plaintiff's entitlement to relief.  A complaint has to
> "show" such an entitlement with its facts.  See Phillips,
> 515 F.3d at 234-35.  As the Supreme Court instructed in
> Iqbal, "[w]here the well-pleaded facts do not permit the
> court to infer more than the mere possibility of misconduct,
> the complaint has alleged-but it has not 'show [n]'-'that
> the pleader is entitled to relief.'"  Iqbal, [129 S.Ct. at
> 1949-50].  This "plausibility" determination will be "a
> context-specific task that requires the reviewing court to
> draw on its judicial experience and common sense." Id

Fowler, 578 F.3d at 210-211.

This Court is mindful, however, that the sufficiency of this pro se pleading must be construed liberally in favor of Plaintiff, even after Iqbal.  See Erickson v. Pardus, 551 U.S. 89 (2007).  Moreover, a court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility. See Grayson v. Mayview State Hosp., 293 F.3d 103, 110-111 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir. 2000).

12

### III.  SECTION 1983 ACTIONS

Graham brings this action pursuant to 42 U.S.C. § 1983.

Section 1983 provides in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory ... subjects, or causes to be subjected,
> any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other
> proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must

allege, first, the violation of a right secured by the

Constitution or laws of the United States and, second, that the

alleged deprivation was committed or caused by a person acting

under color of state law.  West v. Atkins, 487 U.S. 42, 48

(1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir.

1994).

### IV.  THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT

The New Jersey SVPA, N.J.S.A. 30:4-27.24 *et seq.*, provides

for the custody, care and treatment of involuntarily committed

persons who are deemed to be sexually violent predators ("SVP").

N.J.S.A. 30:4-27.26.  The New Jersey Department of Corrections

("DOC") operates the facilities designated for SVPs, N.J.S.A.

30:4-27.34(a); and the New Jersey Department of Human Services

("DHS") provides for their treatment.  N.J.S.A. 30:4-27.34(b).

The SVPA was amended in 2003 to require that regulations be

promulgated jointly by the DOC and the DHS, in consultation with

of the Attorney General, taking "into consideration the rights of the patients as set forth in section ten of P.L. 1965, c. 59 (C. 30:4-24.2) ... [to] specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators." N.J.S.A. 30:4-27.34(d).

In passing the SVPA, the New Jersey Legislature made specific findings regarding SVPs. N.J.S.A. 30:4-27.25.  The Legislature noted that it was necessary to modify the previous civil commitment framework and additionally separate SVPs from other persons who have been civilly committed. Id.  The SVPA defines a SVP as:

> ... a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

Those persons committed under the SVPA shall receive annual review hearings. N.J.S.A. 30:4-27.35.  A SVP may be released from involuntary civil commitment upon recommendation of the DHS or by the SVP's own petition for discharge. N.J.S.A. 30:4-27.36.

### V.   ANALYSIS

#### A.   Transfer to Prison Facility Claim

Graham reiterates his primary complaint in Graham v. Christie, et al., Civil No. 10-2010 (KSH), which was dismissed in October 2010.  Namely, Graham complains that he has been

transferred to a prison facility, as a civilly committed person under the SVPA, and that such placement is unconstitutional where he is subject to the prison policies in place for the orderly operation and security of a prison facility.  The Honorable Katharine S. Hayden, U.S.D.J., dismissed this claim, with prejudice, in her Opinion and Order issued on or about October 18, 2010, based on the Supreme Court's ruling in Kansas v. Hendricks, 521 U.S. 346 (1997).

In Kansas v. Hendricks, the Supreme Court examined the conditions of confinement provided by Kansas' Sexually Violent Predator Act.  The Act called for the confinement of sexually violent predators in a secure facility because they were dangerous to the community.  Id., 521 U.S. at 363-64.  Pertinent here, the Supreme Court was aware that the sexually violent predators in Kansas were to be held in a segregated unit within the prison system.  However, the Court noted that the conditions within the unit were essentially the same as conditions for other involuntarily committed persons in mental hospitals.  Moreover, confinement under the Act was not necessarily indefinite in duration, and the Act provided for treatment.  Id., 521 U.S. at 363, 364, 365-368.  Thus, the Supreme Court held that involuntary confinement under Kansas' SVPA was not unconstitutional so long as such civilly-confined persons are segregated from the general prison population and afforded the same status as others who have been civilly committed.  Id., 521 U.S. at 368-69.  See also

Seling v. Young, 531 U.S. 250, 261062 (2001)(holding same with respect to the State of Washington's SVPA).

Here, the New Jersey SVPA is essentially the same as the Kansas and Washington SVP statutes that were examined and upheld as constitutional by the Supreme Court in Hendricks and Seling, respectively.[4]  See Bagarozy v. Goodwin, Civil Action No. 08-468 (SRC), 2008 WL 4416455, *7-8 (D.N.J. Sept. 23, 2008); In re Commitment of W.Z., 173 N.J. 109, 801 A.2d 205, 211 (2002). Therefore, this Court finds that Graham's placement and confinement in a Special Treatment Unit for SVP residents that is a segregated unit in the East Jersey State Prison, does not, in and of itself, violate the U.S. Constitution's Due Process Clause or the Eighth Amendment's prohibition against cruel and unusual punishment.  Accordingly, Graham's claim that his continued confinement in a segregated unit within a prison facility is unconstitutional will be dismissed with prejudice for failure to state a cognizable claim of a constitutional deprivation.

B.  Conditions of Confinement Claim

Although plaintiff's placement in a segregated unit within a prison facility is not, in and of itself, a constitutional

---

[4]  Recently, the Supreme Court held constitutional under the Necessary and Proper Clause, a federal statute that allowed a district court to order the civil commitment of a sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released.  United States v. Comstock, No. 08-1224, __ U.S. __, 130 S.Ct. 1949 (May 17, 2010).  Although these civilly committed persons remained confined at a federal prison, namely, FCI Butner, the Court did not address their place of civil confinement as being unconstitutional.

violation, Graham makes additional allegations concerning the conditions of confinement at the EJSP facility.  For instance, he complains that he is housed in a prison facility subject to restrictions.  See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

Generally, the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, Bell v. Wolfish, 441 U.S. 520, 536 (1979),[5] within the bounds of professional discretion, Youngberg, 457 U.S. at 321-22.  Specifically, in Youngberg, the Supreme Court held that civilly committed persons do have constitutionally protected interests, but that these rights must be balanced against the reasons put forth by the State for restricting their liberties. Id. at 307.  The Constitution is not concerned with de minimis restrictions on patients' liberties.  Id. at 320.  Moreover, "due process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed."  Seling, 531 U.S.

---

[5]  In Bell v. Wolfish, the Supreme Court held that whether a condition of confinement of pretrial detainees violated their constitutional rights turns on whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose.  441 U.S. 520, 535-39, (1979).

at 265.  While the nature of an SVP's confinement may factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs. See Andrews v. Neer, 253 F.3d 1052, 1061 (8th Cir. 2001)(applying the Fourteenth Amendment's "objective reasonableness" standard to excessive force claims brought by civilly committed SVPs).

Graham's main allegation with respect to the conditions of his confinement relates to his contention that he is now housed in a prison facility and has been treated like a prisoner and subjected to prison rules.  For instance, he complains that his electronic equipment was seized in October 2010, pursuant to a policy memorandum.  Graham also complains that he was subjected to a strip search on one occasion.   Movement to group sessions are controlled by the prison staff, mail is sent to a different location, and any resident who complains will be placed in MAP status.

The Third Circuit has held that placement of a civilly committed SVP in segregated confinement does not violate due process unless the deprivation of liberty is in some way extreme. See Deavers v. Santiago, 243 Fed. Appx. 719, 721 (3d Cir. 2007)(applying Sandin v. Conner, 515 U.S. 472 (1995),[6] to

_____

[6]  In Sandin, the Supreme Court held that there was no cognizable liberty interest in freedom from additional restraint in a prison setting.  See 515 U.S. at 486 ("We hold that [the prisoner's] discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State

segregated confinement of civilly committed SVPs).  See also
Thielman v. Leean, 282 F.3d 478 (7th Cir. 2002)(likewise
extending Sandin to civil commitment settings).  Thus, Graham's
general allegation that disruptive and agitative residents may be
placed in MAP status, and that general movement is monitored and
restricted, without more, fails to articulate a cognizable claim
of constitutional magnitude, in light of Deavers.  Graham fails
to allege any facts to show that MAP restrictions and movements
within the EJSP facility are unduly extreme and unrelated to the
purposes for which such restrictions are imposed.  Moreover, he
admits that he has not been placed on MAP status at this time.
This is Graham's third attempt to articulate a claim for relief,
and he has failed to do so yet again.  Therefore, his general
conditions claim will be dismissed with prejudice for failure to
state a claim.

Additionally, for the following reasons, this Court finds
that Graham's complaints about the mail restrictions, strip
search, and confiscation of electronic devises are not extreme
conditions of plaintiff's confinement as a civilly committed
person, and thus, do not violate due process.

1.  *Unlawful Search Claim*

Graham alleges that residents are subjected to cell
searches, "pat down" searches, or strip searches when
leaving/returning to the STU at EJSP for yard recreation or for

_____

might conceivably create a liberty interest.").

19

visitation.  In particular, Graham alleges that he was strip searched on one occasion after returning from the yard.  He asserts that as a civilly committed person, such searches are unconstitutional and violate his rights under the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures."  U.S. CONST. amend. IV.  Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself."  Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988)(quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)).  "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  Id. at 619 (quotation marks and internal citation omitted).

In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prisoner argued that a cell search conducted to harass him was unreasonable because a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose.  Id. at 529.  The Supreme Court rejected the claim because "prisoners have no legitimate expectation of privacy."  Id. at 530.  The Court observed that:

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order.... [S]ociety would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.... [I]t is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

Id. at 527-28 (footnotes, citations and internal quotation marks omitted).  The same conclusion was reached with respect to pretrial detainees other than convicted prisoners.  See Bell v. Wolfish, 441 U.S. 520, 558-560 (1979)(finding that a body cavity searches of pretrial detainees do not violate the Fourth Amendment).[7]

Consequently, involuntarily committed patients and SVPs, like pretrial detainees, are entitled to some protection under the Fourth Amendment, but they do not have an expectation of privacy equal to an individual in society generally.  See Serna v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009)(noting that pretrial detainees are kept in custody because there is cause to believe

_____

[7]   In Bell v. Wolfish, the United States Supreme Court, in determining the constitutionality of post-visitation body cavity searches, held that a reasonableness test should be employed when examining the constitutionality of a search that encroaches upon the personal privacy of an inmate and the integrity of the inmate's body.  In other words, courts must balance the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  441 U.S. 520, 559 (1979); see also Turner v. Safley, 482 U.S. 78 (1987) (a prison regulation which infringes upon an inmate's constitutionally recognized right is valid only if it is reasonably related to a legitimate penological interest).

they are dangerous; similarly, commitment under Minnesota law as a sexually dangerous person requires a finding of dangerousness), cert. denied, 130 S.Ct. 465 (2009); Allison v. Snyder, 332 F.3d 1076-79 (7th Cir. 2003)(SVPs may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not technically be "punished"), cert. denied, 540 U.S. 985 (2003); Aiken v. Nixon, 236 F. Supp.2d 211, 233 (N.D.N.Y. 2002), aff'd 80 Fed. Appx. 146 (2d Cir. 2003); see also, Jennings v. New York State Office of Mental Health, 786 F. Supp. 376, 382, 384 (S.D.N.Y. 1992), aff'd, 977 F.2d 731 (2d Cir. 1992).

Similarly, the United States Court of Appeals for the Ninth Circuit has held that, because SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others, they are subject to "[l]egitimate, non-punitive government interests" such as "maintaining jail security, and effective management of [the] detention facility." Jones v. Blanas, 393 F.3d 918, 932 (9th Cir. 2004). Thus, the reasonableness of a particular search or seizure is determined by reference to the detention context and is a fact-intensive inquiry. Id.

Here, with respect to his Fourth Amendment claim, Graham's primary argument appears to be that any prison actions that did not specifically take into account his classification as a SVP is per se a constitutional violation. Applying the balancing test

employed by Wolfish, this Court finds that general pat searches conducted on residents entering the yard or returning to the unit from yard time are plainly reasonable and do not violate plaintiff's Fourth Amendment rights.  See Semler v. Ludeman, 2010 WL 145275, *19, D. Minn. Jan. 8, 2010)(finding no Fourth Amendment violation where plaintiffs were required to submit to pat searches following gym use and kitchen work assignments that included removal of socks and shoes, opening their mouths, showing their zippers, showing behind their ears and running their fingers through their hair; search was "not highly intrusive" and was "not unlike the scope of searches of the general public at airport security checkpoints).  See also Serna v. Goodno, 567 F.3d 944, 955-56 (upholding reasonableness of a facility-wide visual body cavity search after a cell phone case (cell phones considered contraband) was found, because, while invasive, the searches were conducted privately, safely, and professionally, and the facility was reacting to a recurring problem involving contraband cell phones0, cert. denied, 130 S. Ct. 465 (Oct. 20, 2009).

Moreover, there are no allegations that the guards conducted any pat search or the cell search for electronic equipment in a menacing or degrading manner.  Graham does not allege that there was physical force used or that the search was done in a menacing manner.  See Kitchens v. Mims, 2010 WL 1240980 (E.D.Cal. March 25, 2010).

Likewise, the single strip search incident fails to state a claim of constitutional magnitude.  The strip search was done after Graham had been to the yard.  While Graham alleges that the strip search was not performed in a private area and that the officers were verbally degrading him, Graham does not allege any physical force was used, or that it was conducted solely for the purpose of punishment.

Therefore, based on all of these factors, this Court will dismiss Graham's Fourth Amendment unlawful search claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a cognizable claim under § 1983.

2. *Interference With Mail*

Next, Graham seems to complain that his mail must be sent to Avenel rather than directly to the EJSP unit where he is confined.  The Court perceives this claim as asserting a violation of plaintiff's First Amendment rights.  However, Graham does not indicate that he has not received mail or packages, or that his mail has been opened outside his presence.  Rather, he merely alleges that he believes his mail is being monitored without any factual support for the bald claim.  This claim is essentially duplicative of a claim Graham raised in his second action, which was dismissed by this Court.

As a general rule, inmates have a limited liberty interest in their mail under the First and Fourteenth Amendments.  Jones v. Brown, 461 F.3d 353, 358 (3d Cir. 2006), cert. denied, 549

U.S. 1286 (2007).[8]  However, an inmate's constitutional right to
send and receive mail may be restricted for legitimate
penological interests.  See Thornburgh v. Abbott, 490 U.S. 401,
407 (1989); Turner v. Safley, 482 U.S. 78, 89 (1987).  In Turner,
the Supreme Court of the United States found that a prison
regulation infringing on an inmate's constitutional rights is
valid so long as it is reasonably related to a legitimate
penological interest.  Id. at 89.  The Court established a
balancing test pursuant to which courts analyze prohibitions on
prisoners' exercise of their constitutional rights by considering
the following four factors: (1) whether prohibiting an inmate
from exercising a constitutional right is rationally related to a
legitimate governmental interest; (2) whether there are
alternative means of exercising that right; (3) what effect

---

[8]  In Jones v. Brown, the United States Court of Appeals for
the Third Circuit held that the legal mail policy of state prison
in opening legal mail outside the presence of the inmate violated
the inmate's First Amendment right to freedom of speech, and was
not reasonably related to prison's legitimate penological
interest in protecting health and safety of prisoners and staff.
461 F.3d at 358.  The Third Circuit also has held that "a pattern
and practice of opening properly marked incoming court mail
outside an inmate's presence infringes communication protected by
the right to free speech.  Such a practice chills protected
expression and may inhibit the inmate's ability to speak,
protest, and complain openly, directly, and without reservation
with the court."  Bieregu v. Reno, 59 F.3d 1445, 1452 (3d Cir.
1995) (applying the Turner analysis), implied overruling on other
grounds recognized in Oliver v. Fauver, 118 F.3d 175, 177–78 (3d
Cir. 1997).  Thus, the assertion that legal mail is intentionally
opened and read, delayed for an inordinate period of time, or
stolen may state a First Amendment claim.  See, e.g., Antonelli
v. Sheahan, 81 F.3d 1422, 1431–32 (7th Cir. 1996); Castillo v.
Cook County Mail Room Dep't, 990 F.2d 304 (7th Cir. 1993).

accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights. Turner, 482 U.S. at 89-91.  The Court also recognized that deference should be given to the decisions of prison administrators, especially when those decisions deal with issues of prison safety and security.  Id.

The United States Court of Appeals for the Third Circuit has applied Turner in analyzing constitutional claims by civilly committed SVPs.  See Rivera v. Rogers, 224 Fed. Appx. 148, 2007 WL 934413 (3d Cir. March 29, 2007)(applying Turner in analyzing claims of SVPs that opening of their packages violated their First Amendment rights).  Other courts likewise have applied Turner when analyzing claims brought by civilly committed SVPs alleging First Amendment violations.[9]  See Willis v. Smith, 2005 WL 550528 (N.D. Iowa Feb. 28, 2005)(noting that status of SVPs was substantially similar to that of prisoners and applying Turner to SVP claims concerning mail handling procedures); Ivey v. Mooney, 2008 WL 4527792, at *4 n. 7 (D. Minn. Sept. 30,

---

[9]  Essentially, the First Amendment analysis under Turner mirrors the due process analysis under Youngberg; in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside.  See Beaulieu v. Ludeman, 2008 WL 2498241, at *20 n. 15 (finding Turner to be consistent with Youngberg because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so").

2008)(applying Turner, but noting that a civil confinement is significantly different from a criminal confinement); Francis v. Watson, 2006 WL 2716452, at *3 (D.S.C. Sept. 22, 2006)(citing cases that have applied Turner in cases involving civilly confined persons); Marsh v. Liberty Behavioral Health Care, Inc., 2008 WL 821623, at *5 (M.D. Fla. Mar. 27, 2008), aff'd 330 Fed. Appx. 179 (11th Cir. 2009); Beaulieu v. Ludeman, 2008 WL 2498241, at *20 (D. Minn. June 18, 2008).

In Rivera, the Third Circuit affirmed the district court's ruling that a facility housing civilly committed SVPs has a legitimate interest in both the safety of its facility and the rehabilitation of its patients.  Rivera, 224 Fed. Appx. at 151 (citing Waterman v. Farmer, 183 F.3d 208, 215 (3d Cir. 1999)("[I]t is beyond dispute that New Jersey has a legitimate penological interest in rehabilitating its most dangerous and compulsive sex offenders.")).  Specifically, the court upheld as constitutional the STU's policy that allows staff to open packages not marked as "legal mail" to assure that the packages do not contain contraband (i.e., items either harmful to staff and residents, or detrimental to rehabilitation).  The court found that plaintiff was free to send and receive mail so long as the content of his mail was not sexually explicit.  Moreover, the Third Circuit found no error in the district court's conclusion that there were no ready alternatives to mail security and that the STU's policy appeared to be the only viable alternative, thus

supporting the reasonableness of the mail policy.  Rivera, 224
Fed. Appx. at 151.

Here, this Court likewise finds that it is beyond dispute
that the staff at EJSP, where plaintiff and other SVP residents
are newly housed, has a legitimate interest in both the safety of
its facility and rehabilitating its patients.  As noted above,
these civilly committed persons are convicted sexual predators,
which makes safety at EJSP a very important concern.  The staff
clearly must determine if any items coming through the mail pose
a threat to the safety of the staff or the other residents.  They
also must decide if any of the materials passing through the mail
could be detrimental to a resident's therapy.  Consequently, as
set forth by the Supreme Court and the Third Circuit, the Court
must defer to the prison officials when it comes to issues of
managing a safe and operational prison facility.  In this case,
delivery of letters and packages at the Avenel facility located
close by, where the staff is trained with respect to SVP issues
unlike the general NJDOC staff at EJSP, assures that harmful
materials are not being passed through the mail, but also allows
for specialized treatment regarding SVP residents.  This mail
policy, which appears to be instituted because of the recent
transfer of the SVP residents to EJSP, clearly bears a rational
relationship to both interests discussed above.

Moreover, in his interference with the mail claim, Graham
fails to allege even a single incident of interference with his

mail.  A single interference with the delivery of an inmate's personal mail, without more, does not rise to the level of a constitutional deprivation.  <u>Morgan v. Montayne</u>, 516 F.2d 1367 (2d Cir. 1975), <u>cert</u>. <u>denied</u>, 424 U.S. 973 (1976).  Thus, the only continuing complaint seems to be that his mail is sent to another facility instead of EJSP where he now resides.  Graham fails again to articulate a claim that prison officials are intentionally delaying or opening his mail.  Therefore, the Court will dismiss this claim with prejudice for failure to state a claim for relief under § 1983.

3.  *Confiscation of Electronic Devices*

Graham also complains about a new policy memo issued on November 1, 2010 that restricts certain electronic equipment (memory sticks; flash drives; thumb drives; detachable or external drives; data storage devices; X-box Elite, Play Station 3 and Wii game systems; and remote controls with digital read out or viewing screens) for SVP residents in the EJSP STU.  He complains that anyone in possession of such electronic devices will have such equipment confiscated in violation of his constitutional rights.  It would appear that plaintiff is asserting a duplicative deprivation of property claim and/or a First Amendment violation, as an identical claim was raised by Graham in his second action, <u>Graham v. Main, et al.</u>, Civil No. 10-5027 (SRC), which this Court dismissed for the reasons reiterated below.

29

This Court finds that a First Amendment claim, if asserted, is governed by the standard in Turner v. Safely, supra, which sets out the standard for challenges to regulations that restrict a prisoner's fundamental constitutional rights.  Although the courts have not defined the contours of a civilly detained person's right to free speech, Graham's rights are at least co-extensive with the rights of prisoners with respect to institutional regulations that curtail First Amendment rights. E.g., City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)("[T]he due process rights of a [pretrial detainee or other persons in state custody] are at least as great as the Eighth Amendment protections available to a convicted prisoner"). Thus, a Turner analysis is applicable here despite the fact that plaintiff is not a prisoner.  See e.g., Bell v. Wolfish, 441 U.S. at 545-46 ("A detainee simply does not possess the full range of freedoms of an unincarcerated individual" because "[t]he fact of confinement as well as the legitimate goals and policies" of the institution limit constitutional rights.); Allison v. Snyder, 332 F.3d 1076, 1079 (7th Cir. 2002)(persons confined as sexually violent "may be subjected to the ordinary conditions of confinement").

In the prison setting, regulations that restrict a prisoner's access to use and own electronic equipment are "valid [if they] are reasonably related to legitimate penological interests." Thornburgh v. Abbott, 490 U.S. 401, 413 (1989)

(citing Turner, 482 U.S. at 89).  Applying the Turner rule to an institutional setting such as EJSP, institution regulations that restrict a patient's First Amendment rights are valid if they are reasonably related to a legitimate institutional interests, such as maintaining security, preserving internal order and rehabilitation.  McKune v. Lile, 536 U.S. 24, 36 (2002) ("[R]ehabilitation is a legitimate penological interest that must be weighed against the exercise of an inmate's liberty."); Turner, 482 U.S. at 91 (rehabilitation and maintaining security are legitimate penological interests); Allison, 332 F.3d at 1079 (preventing escape and assuring safety of others are legitimate institutional interests).

Here, this Court finds that the first Turner factor is satisfied because the EJSP STU new rule prohibiting these delineated electronic devices are reasonably related to the legitimate institutional interests of security and the orderly running of the EJSP.  The November 1, 2010 memo regarding the new rule, which was attached by plaintiff to his Complaint, expressly states that security and orderly operation of the facility is the purpose of the rule change.  Indeed, this Court finds that EJSP STU has a legitimate interest in maintaining security of its facility by preventing residents from improperly using computers to engage in fraud, extortion and other criminal activity and preventing discord that could occur between residents owning the electronic equipment targeted with those who do not.  See Semler

31

v. Ludeman, 2010 WL 145275, *9-16 (D. Minn. Jan. 8, 2010)
(institution rules governing media, mail, personal property,
telephone access and association between patients confined as
sexually violent persons are valid under Turner because they are
reasonably related to legitimate security and rehabilitative
interests); Spicer v. Richards, 2008 WL 3540182, *7-8 (W.D. Wash.
Aug. 11, 2008)(state facility for civil detainee's "ban on the
possession of electronic devices is reasonably related to the
security and safety risks posed to [its] residents, staff,
visitors, and the public," and therefore not violative of civil
detainee's constitutional rights).  In addition, the EJSP STU has
an interest in promoting rehabilitation and a therapeutic
environment by preventing patients from accessing pornography,
contacting their victims, viewing movies that may reinforce
cognitive distortions or sexual deviance and playing video games
that may encourage anti-social or obsessive behavior.  See
Hedgespeth v. Bartow, 2010 WL 2990897 at *6-7 (W.D. Wisc. July
27, 2010).

Moreover, defendants have a legitimate security interest in
making uniform rules regarding property ownership and media
restrictions to prevent discord, extortion and unauthorized
property exchanges among patients, as well as legitimate security
and rehabilitative interests in keeping potential damaging
materials out of the institution altogether.  See Allison, 332

F.3d at 1079 (security is legitimate institutional interest);
Hedgespeth, 2010 WL 2990897 at *8.

The third Turner factor also weighs heavily in favor of the
defendants' new electronic restrictions.  Allowing residents to
own digital storage devices, video game systems and the other
listed electronic devices would be a security, treatment and
administrative nightmare.  Security staff would need to screen
each resident's electronic equipment for unauthorized content
regularly and frequently.  Additionally, because it is relatively
easy to hide and transfer digital files by these restricted
devices, some residents likely would succeed in caching and
accessing unlawful or counter-therapeutic data.  Thus,
unrestricted access to the internet and video games at EJSP STU
likely would interfere with the efforts to treat the patients and
operate the facility in a secure and orderly manner.  Hedgespeth,
supra.

Finally, this Court notes that Graham has failed to
articulate any reason or alternative that would refute the
clearly expressed security need for the new restriction on
electronic devices.  He simply states a legal claim that his
constitutional rights will be violated without any factual
support.  Such claim does not pass muster for statement of a
claim under the Iqbal standard.

Facilities that house and deal with residents who have been
involuntarily committed for sexual disorders are "'volatile'

33

environments whose day-to-day operations cannot be managed from on high." Thielman v. Leean, 282 F.3d 478, 483 (7th Cir. 2002). Courts must presume that the judgment exercised by the appropriate professionals in these facilities is reasonable. Id. (citing Youngberg v. Romeo, 457 U.S. 307, 312-24 (1982) (extending "professional judgment" standard to substantive due process claim brought by involuntarily committed mental patient and noting that such a presumption was "necessary to enable institutions of this type-often, unfortunately, overcrowded and understaffed-to continue to function"); see also Hedgespeth, 2010 WL 2990897 at *9. Accordingly, this Court finds that Graham has failed to state a claim of constitutional magnitude in this regard.

Finally, to the extent that plaintiff is raising a deprivation of property claim, his claim must be dismissed for failure to state a claim. The Fourteenth Amendment provides, in pertinent part here, that the State may not "deprive any person of life, liberty, or property, without due process of law[.]" The "due process of law" essentially requires that the government provide a person notice and opportunity to be heard in connection with the deprivation of life, liberty or property. Zappan v. Pennsylvania Board of Probation and Parole, 152 Fed. Appx. 211, 220 (3d Cir. 2005)("The essential requirements of any procedural due process claim are notice and the opportunity to be heard."). Hence, to establish a prima facie case of a procedural due

34

process violation, a plaintiff must establish: (1) a deprivation of a constitutionally protected liberty or property interest, (2) state action, and (3) constitutionally inadequate process.  See Rusnak v. Williams, 44 Fed. Appx. 555, 558 (3d Cir. 2002) ("Procedural due process claims, to be valid, must allege state sponsored-deprivation of a protected interest in life, liberty or property.  If such an interest has been or will be deprived, procedural due process requires that the governmental unit provide the individual with notice and a reasonable opportunity to be heard.")(citation omitted).

To have a property interest, Graham must demonstrate "more than an abstract need or desire for it. ... He must, instead, have a legitimate claim of entitlement to it" under state or federal law.  Board of Regents v. Roth, 408 U.S. 564, 577 (1972). For present purposes, a procedural due process analysis involves a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that interest comported with constitutional requirements.  Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Here, as demonstrated above, the restrictions on electronic devices are neither arbitrary or capricious, but plainly were implemented in order to address the security and operational concerns of a prison facility, which also houses civilly

committed sex offenders.  Graham has not demonstrated a
constitutionally-recognized property interest in the continued
possession of unrestricted electronic devices necessary to
satisfy the threshold requirement of a deprivation of property
interest.  See Semler v. Ludeman, 2010 WL 145275, *25 (D. Minn.
Jan. 8, 2010).

Furthermore, to the extent that Graham may have had
electronic equipment confiscated, as alleged, he has a post-
deprivation remedy.  Property loss caused by the intentional acts
of government officials does not give rise to a procedural due
process claim under § 1983 where a post-deprivation remedy
satisfying minimum procedural due process requirements is
available under state law.  See Parratt v. Taylor, 451 U.S. 527
(1981) (overruled in part on other grounds by Daniels v.
Williams, 474 U.S. 327 (1986)); see also Zinermon v. Burch, 494
U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984);
Holman, 712 F.2d at 856.[10]  The New Jersey Tort Claims Act
("NJTCA"), N.J. STAT. ANN. § 59:1-1 et seq., provides a post-
deprivation judicial remedy to persons who believe they were

---

[10]  In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982),
the Supreme Court explained, however, that post-deprivation
remedies do not satisfy the Due Process Clause if the deprivation
of property is accomplished pursuant to established state
procedure rather than through random, unauthorized action.  455
U.S. at 435-36.  But see Tillman v. Lebanon Co. Correctional
Facility, 221 F.3d 410, 421 n.12 (3d. Cir. 2000)(citing United
States v. James Daneil Good Real Property, 510 U.S. 43, 53
(1993))(in "extraordinary situations" such as routine deduction
of fees from a prisoner's account even without authorization,
post-deprivation remedies may be adequate).

deprived of property at the hands of the State or local government.  <u>See</u>  <u>Holman</u>, 712 F.2d at 857; <u>Asquith v. Volunteers of America</u>, 1 F. Supp.2d 405, 419 (D.N.J. 1998), <u>aff'd</u> 186 F.3d 407 (3d Cir. 1999).

Therefore, any deprivation of property claim asserted by Graham here will be dismissed with prejudice for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

C.  <u>Denial of Treatment Claim</u>

Graham also continues to assert that therapy/treatment sessions have been disrupted or denied because of the prison setting and control by NJDOC officials over movements and conduct of the residents in the EJSP-STU.  In particular, Graham alleges that he has been restricted from participating in therapy and treatment sessions with his "mental support" group, who are housed elsewhere at the EJSP-STU.  He complains that his "mental support" has been taken off his unit, and that he has been placed on treatment probation.  Graham further alleges that staff psychologists have no offices at the EJSP-STU and that there is no on-site psychiatrist at the facility after 4:00 p.m.  Therapy groups are conducted on gated tiers and boarded rooms, and the NJDOC staff conduct or dictate group movements, making an "untherapeutic" environment.  Thus, Graham appears to argue that he is denied the right to adequate treatment and reasonable care applicable to civilly committed SVPs, in violation of the Fourteenth Amendment.  This claim had been raised in Graham's earlier action, Civil No. 10-5027 (SRC), in which this Court

found no constitutional violation sufficient to state a claim under § 1983. Because these allegations are mostly duplicative of the claim raised in Graham's earlier action before this Court, the Court reiterates its finding, as follows, that Graham's claim for relief must be dismissed for failure to state a claim of any constitutional deprivation.

The Fourteenth Amendment to the United States Constitution, § 1, guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." This due process guarantee has been interpreted to have both procedural and substantive components, the latter which protects fundamental rights that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." Palko v. Conn., 302 U.S. 319, 325 (1937). These fundamental rights include those guaranteed by the Bill of Rights, as well as certain liberty and privacy interests implicitly protected by the Due Process Clause, such as the right to marry. Washington v. Glucksberg, 521 U.S. 702, 720 (1997). Substantive due process also protects against government conduct that is so egregious that it "shocks the conscience," even where the conduct does not implicate any specific fundamental right. See United States v. Salerno, 481 U.S. 739, 746 (1987).

Laws disturbing fundamental rights receive strict scrutiny and will be upheld if they are "narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993). However, regulations not implicating fundamental rights

(in other words, those claims attacking particularly egregious or arbitrary governmental actions) are analyzed under the deferential standard referred to as the rational basis review, and will generally succeed only if the government action shocks the conscience.  See Glucksberg, 521 U.S. at 728.

With respect to Graham's claim, it appears that he is asserting that he has a fundamental right to adequate treatment as a civilly committed sex offender, and that as a result of the prison setting he is not being afforded adequate treatment.  The Supreme Court established that there exists a constitutionally protected right of mentally retarded persons confined at a state institution to minimally adequate treatment.  Specifically, the Supreme Court held that there is a constitutional right of mentally disabled persons confined at a state institution to "minimally adequate habilitation", self-care treatment or training to the extent necessary to protect their recognized fundamental rights to safety and freedom from physical restraints.  Youngberg, 457 U.S. at 316, 319 and 322.

The Supreme Court further held that, where a fundamental right is at issue, a district court must balance "the liberty of the individual and the demands of an organized society" to determine whether such right has been violated.  Youngberg, 457 U.S. at 320.  Although restrictions burdening a fundamental right generally receive strict scrutiny, in Youngberg, the Supreme Court found that this sort of rigorous analysis would unduly burden the ability of states, specifically their professional

employees, to administer mental health institutions.  Id. at 322.
Consequently, the Court concluded that "the Constitution only
requires that the courts make certain that professional judgment
was in fact exercised," because "[i]t is not appropriate for the
courts to specify which of several professionally acceptable
choices should have been made."  Id. at 321 (internal quotation
and citation omitted).  Thus, a decision, "if made by a
professional, is presumptively valid; liability may be imposed
only when the decision by the professional is such a substantial
departure from accepted professional judgment, practice, or
standards as to demonstrate that the person responsible actually
did not base the decision on such judgment."  Id. at 323.

In Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002), the United
States Court of Appeals for the Third Circuit held that New
Jersey's unique former statutory scheme for sex offenders that
predicated the term of sentence on a prisoner's response to
treatment and created a right to treatment created a fundamental
and cognizable liberty interest in treatment, for purposes of
both procedural and substantive due process analyses.  288 F.3d
at 545.  Leamer was not a civilly committed sex offender like
plaintiff here.  Rather, Leamer was a convicted sex offender
whose confinement and treatment were inextricably linked pursuant
to statute.  The sentencing court had classified Leamer as having
a "mental aberration" and in need of "specialized treatment,"
which automatically subjected Leamer to the maximum incarceration
permitted by law unless he is cured prior to that point.  Leamer

could not reduce his sentence through good behavior credits,
parole policies or other credits.  Instead, he could only shorten
his incarceration through successful therapy, which was an
"inherent and integral element" of the statutory scheme.
Consequently, the Third Circuit found that deprivation of
treatment would be a grievous loss not emanating from the
sentence.  Leamer, 288 F.3d at 544.

       Apart from that recognized in Youngberg to prevent the
violation of recognized fundamental rights to safety and freedom
from physical restraints, this Court finds the Third Circuit's
holding in Leamer to clearly extend to an involuntarily committed
sex offender under New Jersey's SVPA.  Like Leamer, the length of
Graham's confinement under the SVPA is predicated on his response
to treatment.  Indeed, the provisions of the SVPA explicitly
recognize New Jersey's obligation to provide treatment to SVPs
for their eventual release based on successful therapy.  See
N.J.S.A. 30:4-27.32(a)("If the court finds by clear and
convincing evidence that the person needs continued involuntary
commitment as a sexually violent predator, it shall issue an
order authorizing the involuntary commitment of the person to a
facility designated for the custody, care and **treatment** of
sexually violent predators")(emphasis added); N.J.S.A. 30:4-
34(b)("The Division of Mental Health Services in the Department
of Human Services shall provide or arrange for treatment for a
person committed pursuant to this act.  Such treatment shall be
appropriately tailored to address the specific needs of sexually

violent predators."); N.J.S.A. 30:4-27.36(a)(At any time during
the involuntary commitment of a person under this act, if the
person's treatment team determines that the person's mental
condition has so changed that the person is not likely to engage
in acts of sexual violence if released, the treatment team shall
recommend that the Department of Human Services authorize the
person to petition the court for discharge from involuntary
commitment status"); see also Kansas v. Hendricks, 521 U.S. 346,
367 (1997)(concluding from similarly-worded provisions of Kansas
SVP Act that "the State has a statutory obligation to provide
'care and treatment for [persons adjudged sexually dangerous]
designed to effect recovery ....")(alterations in
original)(internal citations omitted).

Therefore, based on Youngberg and Leamer, this Court
concludes that Graham may have a fundamental liberty interest in
treatment, but again has failed to state a cognizable claim for
purposes of both procedural and substantive due process analyses.
See Bailey v. Gardebring, 940 F.2d 1150, 1154 (8th Cir. 1991),
cert. denied, 503 U.S. 952 (1992)(where the Eighth Circuit noted
that Youngberg did not establish a right for the civilly
committed to treatment per se; the Supreme Court only "held that
the Constitution required only such 'minimally adequate training
... as may be reasonable in light of [the] liberty interest[ ] in
safety and freedom from unreasonable restraints.'")(quoting
Youngberg, 457 U.S. at 322).  In Bailey, the Eighth Circuit
concluded that plaintiff had no right to "psychiatric treatment

to overcome a 'sexual offender condition'" because he "was
neither in danger during his civil commitment nor was he subject
to any restraints beyond the ordinary incidents of any
involuntary confinement." Id. at 1153, 1154. Citing Bailey,
district courts in the Eighth Circuit have since concluded that
civilly committed sexual predators have no substantive due
process right to mental health treatment, adequate or otherwise.
See Semler v. Ludeman, 2010 WL 145275, at *26 (D. Minn. Jan. 8,
2010)("Because this Court has not recognized a constitutional
right to effective 'treatment' in the context of civilly
committed sex offenders, Plaintiffs [alleging substantive due
process violations through ineffective treatment] have failed to
allege a due process claim ....")(citing Nicolaison v. Ludeman,
2008 WL 508549, at *8 (D. Minn. Feb. 11, 2008)(finding, in
ultimately concluding that involuntarily committed sex offender's
right to treatment is not "clearly established" for purposes of
28 U.S.C. § 2254(d)(1), that Youngberg "only recognized a right
to 'minimally adequate' treatment that reduces the need for
restraints," and not a "comparable right to treatment that
facilitates release")).

Indeed, based on the allegations and admissions by plaintiff
in his Complaint, Graham again has failed to show any procedural
or substantive due process violations. He is merely reiterating
the same arguments and allegations that failed to pass muster in
his earlier actions, Civil No. 10-2010 (KSH) and Civil No. 10-
5027 (SRC). Graham does not demonstrate a categorical denial of

therapy and treatment sessions due to the prison setting in which
he receives his treatment.  Rather, his duplicative allegations
simply demonstrate his continued dissatisfaction with his
therapist's determination or treatment plan that has plaintiff
separated from his "mental support" group.  Moreover, Graham
admits that the restrictions have been based on his own treatment
refusal, although Graham does not fully concede that he himself
has been uncooperative.  Indeed, this Court takes judicial notice
of Graham's earlier-filed action, Civil No. 10-5027 (SSRC), in
which he raises the very same claim and arguments, and where the
allegations in that action show that his treatment phase dropped
due to his missing sessions, for refusing to follow treatment
plan recommendations, and not because of his filing grievances.
In fact, a treatment refusal status memo attached to one of
Graham's addendums in the earlier matter confirms that the status
restriction was imposed due to plaintiff's continued failure to
participate meaningfully or attend his scheduled process group on
a regular basis.  There are simply no factual assertions other
than Graham's bald allegation that his treatment is curtailed as
punishment for filing grievances or complaining.

     In Leamer, the Third Circuit, relying on Sandin, found that
Leamer would face "significant obstacles" in establishing a
procedural due process claim based on his placement on RAP
(restricted activities program) status because the mere fact of
placement in administrative segregation is not in and of itself
enough to implicate a liberty interest.  Leamer, 288 F.3d at 546.

Similarly, in the instant case, although Graham and other disruptive and agitative residents may be placed in MAP status in response to their behavior or uncooperation, there is no indication from the allegations here that these residents have been or will be denied treatment.  Moreover, as noted earlier, Graham has not been placed on MAP status.

Indeed, there are no factual allegations of an absolute denial of treatment.  Graham alleges only that prison staff regulate movement and conduct searches and other policy measures for the orderly running and security of the EJSP facility as a whole, which he feels affects his access to the treatment sessions of his choice.  Graham does not allege that he has been denied treatment altogether.  Further, Graham merely recites legal conclusions in his complaint about being made to feel like a "prisoner" rather than a civilly committed person rather than allege any facts to support a claim that he has been denied treatment.  Indeed, he seems mostly fixated on the idea of being in a "prison setting" and does not allege any real disruption or interference with his treatment, except through his own contumacious conduct in being in a "prison setting."  In short, Graham asserts no new or different factual allegations in this third Complaint that would support a claim that he has been denied treatment or that his treatment is constitutionally inadequate.

This Court likewise finds no substantive due process violation at this time.  Substantive due process prevents the

government from engaging in conduct that "shocks the conscience," or interferes with rights "implicit in the concept of ordered liberty." Glucksberg, 521 U.S. at 721.  Under this standard, Defendants' actions in denying Graham his statutory right to treatment will be found unconstitutional under the Fourteenth Amendment if they were so arbitrary or egregious as to shock the conscience.  See Leamer, 288 F.3d at 546-47 (substantive due process claim alleging inadequate treatment for committed sex offender "must focus on the challenged abuse of power by officials in denying [the plaintiff] the treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance toward release").

Here, as demonstrated above, defendants have not categorically declined to provide any mental health treatment to Graham.  Thus, this Court cannot readily conclude that Defendants' actions were conscience-shocking and in violation of Graham's substantive due process rights.  Indeed, plaintiff's allegations, as set forth above, are merely conclusory and factually unsubstantiated.  Graham has not shown any disruption of treatment.  Instead, he simply objects to the manner and place in which treatment and sessions are provided.

Thus, the Court concludes that treatment has not been denied to Graham, as alleged because there is no demonstrated interruption of adequate treatment that would rise to the level of a constitutional due process deprivation as alleged.  Further,

this Court concludes that the allegations asserted in Graham's Complaints do not show such egregious conduct or disruption as to render mental treatment at EJSP conscience-shockingly deficient.

Accordingly, Graham's claim alleging inadequate treatment, his third and essentially duplicative effort, will be dismissed with prejudice for failure to state a cognizable claim of a federal constitutional deprivation.

D.  Harassment Claim

Graham further complains that he has been verbally harassed by correctional officers at EJSP on two occasions.  He states that he was called a "homo" or "fag" and "gender of life" remarks have been made in his presence.  He contends that the verbal harassment has made him feel humiliated and "mentally degraded."  These allegations also are repetitive of a similar claim asserted in his second action, Civil No. 10-5027 (SRC).

Allegations of verbal abuse or threats, unaccompanied by injury or damage, are not cognizable under § 1983, regardless of whether the inmate is a pretrial detainee or sentenced prisoner. See Jean-Laurent v. Wilkerson, 438 F. Supp.2d 318, 324-25 (S.D.N.Y. 2006)(pretrial detainee's claim of verbal abuse not cognizable under § 1983 because verbal intimidation did not rise to the level of a constitutional violation); Ramirez v. Holmes, 921 F. Supp. 204, 210 (S.D.N.Y. 1996)(threats and verbal harassment without physical injury or damage not cognizable in claim filed by sentenced inmate under § 1983).  See also Price v. Lighthart, 2010 WL 1741385 (W.D. Mich. Apr. 28, 2010); Glenn v.

Hayman, 2007 WL 894213, *10 (D.N.J. Mar. 21, 2007); Stepney v.
Gilliard, 2005 WL 3338370 (D.N.J. Dec. 8, 2005)("[V]erbal
harassment and taunting is neither 'sufficiently serious' nor 'an
unnecessary and wanton infliction of pain' under the common
meaning of those terms. 'Verbal harassment or profanity alone ...
no matter how inappropriate, unprofessional, or reprehensible it
might seem,' does not constitute the violation of any federally
protected right and therefore is not actionable under [Section]
1983") (quoting Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 474
(S.D.N.Y. 1998), and citing Collins v. Graham, 377 F. Supp.2d
241, 244 (D.Me. 2005)).  See also Moore v. Morris, 116 Fed. Appx.
203, 205 (10th Cir. 2004)(mere verbal harassment does not give
rise to a constitutional violation, even if it is inexcusable and
offensive, it does not establish liability under section 1983),
cert. denied, 544 U.S. 925 (2005); Collins v. Cundy, 603 F.2d
825, 827 (10th Cir. 1979) (dismissing prisoner's claim that
defendant laughed at prisoner and threatened to hang him);
Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185, 187-89
(D.N.J. 1993)); Abuhouran v. Acker, 2005 WL 1532496 (E.D. Pa.
June 29, 2005)("It is well established ... that ... verbal
harassment, ... standing alone, do[es] not state a constitutional
claim")(citing Dewalt v. Carter, 224 F.3d 607, 612 (7th Cir.
1999); Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999);
Maclean v. Secor, 876 F. Supp. 695, 698 (E.D.Pa. 1995)).  See
also Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987)
(holding that verbal harassment and abuse are not recoverable

48

under § 1983); <u>Patton v. Przybylski</u>, 822 F.2d 697, 700 (7th Cir. 1987)(holding that racially derogatory remarks, although "unprofessional and inexcusable," are not "a deprivation of liberty within the meaning of the due process clause").

Here, Graham does not allege an accompanying violation that might allow the gender and homophobic slurs to state a separate due process violation or equal protection claim.  At most, Graham alleges that he was humiliated and made to feel like a prisoner. These general allegations of "injury" are nothing more than the mere recitation of a legal conclusion without factual allegations sufficient at this time to support a claim that the defendants were verbally harassing plaintiff as an intended form of punishment.  Consequently, because the alleged verbal harassment of Graham was not accompanied by any injurious actions - or physical actions of any kind - by the correction officials, Graham fails to state a cognizable § 1983 claim for a violation of his Fourteenth Amendment due process or Fourteenth Amendment equal protection rights, and his claim will be dismissed with prejudice accordingly.

E.   <u>Retaliation Claim</u>

It would appear that Graham also may be asserting a claim of retaliation against defendants for exercising his right to file grievances.  Graham's Complaint generally alleges that he was placed on the South Unit because he complained and that he is threatened with MAP status.

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution ... ." White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990).  To prevail on a retaliation claim, plaintiff must demonstrate that (1) he engaged in constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights;" and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action.  Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  See also Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)); Thaddeus-X v. Blatter, 175 F.3d 378, 386-99 (6th Cir. 1999), cited with approval in Allah, 229 F.3d at 225.

This Court finds that the allegations of the Complaint and plaintiff's addendums are insufficient to state a claim of retaliation.  Graham has not shown that he was engaging in a constitutionally protected activity that was the substantial or motivating factor in the defendants' decision to take adverse action.  The allegations of the Complaint also fail to show that Graham has suffered adverse action sufficient to deter him from exercising his constitutional rights.  He continues to file grievances, as well as civil complaints in this Court, and he has not yet been placed on MAP status because of this activity.

Moreover, by Graham's own admission in his earlier filed action, Civil No. 10-5027 (SRC), the alleged "threats" of MAP status have been more consistently in response to Graham's contumacious refusal to comply with his treatment program at the EJSP-STU. Rather, it is plain that Graham's allegations are nothing more than a recitation of "labels and conclusions" or the "formulaic recitation of the elements of a cause of action" of retaliation, which is not sufficient to support such a claim of constitutional deprivation. Iqbal, 129 S.Ct. at 1949. He has shown no correlation between his grievances and complaints filed and purported adverse action. Indeed, as noted above, Graham has not yet been placed on MAP status, and his treatment restrictions are based on his treatment refusals and not on any constitutionally protected activity. Therefore, Graham's repetitive claim of retaliation will be dismissed with prejudice for failure to state a claim.

F.   Claim Against Public Advocacy Attorney

Graham also complains that his public advocacy attorney prevented plaintiff from being released to an outpatient program by stopping a staff psychologist to testify in court. The staff psychologist allegedly told Graham "off the record' that Graham "does not belong" at the EJSP-STU. Graham filed an attorney ethics grievance. Graham raised this claim in an addendum to this action as well as an addendum in his earlier filed action, Civil No. 10-5027 (SRC). It is yet another duplicative claim asserted by Graham.

It appears that Graham may be asserting an ineffective assistance of counsel claim, as well as seeking his release from the EJSP-STU.  Graham's potential ineffective assistance of counsel claim against his assigned counsel is not actionable at this time in a § 1983 action.  First, assigned counsel is not subject to liability under § 1983 because the attorney is not a state actor.  See Polk Co. v. Dodson, 454 U.S. 312, 325 (1981) (a public defender performing a lawyer's traditional functions as counsel to a defendant, such as determining trial strategy and whether to plead guilty, is not acting under color of state law); Thomas v. Howard, 455 F.2d 228 (3d Cir. 1972) (court-appointed pool attorney does not act under color of state law).  Even if assigned counsel was a privately retained lawyer, counsel would not be subject to liability under § 1983.  Steward v. Meeker, 459 F.2d 669 (3d Cir. 1972) (privately-retained counsel does not act under color of state law when representing client).

Moreover, even if Graham had pleaded facts establishing that his attorney was acting under color of state law, any claim concerning a violation of plaintiff's right to effective assistance of counsel must first be raised in plaintiff's ongoing state civil commitment proceedings.  A federal court generally will not intercede to consider issues that the plaintiff has an opportunity to raise before the state court.  See Younger v. Harris, 401 U.S. 37 (1971).

To the extent that Graham's civil commitment proceedings are no longer pending, and his continued civil commitment has been

adjudicated, which is not apparent from the Complaint and numerous addendums, any claim of ineffective assistance of counsel in this regard must first be exhausted via state court remedies, *i.e.*, by direct appeal or other available state court review; and then, if appropriate, by filing a federal habeas application, under 28 U.S.C. § 2254, to assert any violations of federal constitutional or statutory law, namely, his claim of ineffective assistance of counsel.  <u>Preiser v. Rodriguez</u>, 411 U.S. 475 (1973).

Therefore, plaintiff's claim against counsel asserting any liability under § 1983, if alleged, must be dismissed for failure to state a claim at this time, pursuant to 28 U.S.C. § 1915A(b)(1).

V.  <u>CONCLUSION</u>

For the reasons set forth above, plaintiff's Complaint will be dismissed with prejudice, in its entirety as against all named defendants, for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and because the Complaint is duplicative and repetitive of the claims asserted in plaintiff's earlier-filed action, Civil No. 10-5027 (SRC).  An appropriate order follows.


    s/ Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

53